Michael MARSH, Plaintiff,

v.

DELTA AIR LINES, INC., Defendant.

Civil Action No. 95–D–530.

United States District Court, D. Colorado.

Feb. 7, 1997.

**1460**

Jeffrey Menter, Greenwood Village, CO, for Plaintiff.

James Hautzinger, Donna K. McNamara, Sherman & Howard, L.L.C., Denver, CO, for Defendant.

## ORDER

DANIEL, District Judge.

### I. Procedural and Factual Background

This is a diversity case, brought pursuant to 28 U.S.C. § 1332, wherein Plaintiff asserts the following claims for relief: Wrongful Discharge (Claim 1); Breach of the Express or Implied in Law or in Fact Covenant of Good Faith and Fair Dealing (Claim 2); and Breach of Contract (Claim 3). (Third Amended Complaint, filed October 25, 1995). Presently pending before the Court are Plaintiff's Motion for Partial Summary Judgment on his Wrongful Discharge Claim, and Defendant's Motion for Summary Judgment on all Claims. Oral argument occurred at a hearing on these motions on January 15, 1997.

The essential facts of this case are uncontroverted. Plaintiff was a Delta employee for 26 years. He was employed as a baggage handler (his official title was customer service agent) at the time of his termination. He was suspended, and later terminated, because he wrote a letter to the editor, criticizing Delta, that was published by the Denver Post. More specifically, in late November, 1994, Plaintiff wrote a letter to the editor of the Denver Post that strongly criticized Delta's decision to employ hourly contract workers to replace laid-off full-time employees. After composing the letter, he took the letter to work so that it could be photocopied.[1] Thereafter, he mailed the letter and it was published by the Post on December 15, 1994. (Defendant's Cross Motion for Summary Judgment, Exhibit C). The letter, as published, stated:

My trusted and faithful employer of more than 26 years has become infected with two of the latest industrial diseases going around—"re-engineering" and "cost-cutting."

Delta Air Lines, a company which is renowned worldwide for its corporate family culture, enthusiastic and professional employees and superior service to customers, has decided to flush 60 years worth of care and paternalism down the executive washroom toilet, putting thousands of loyal Delta employees and their families on hold or in the street.

The company is convinced it can continue to deliver its traditional high levels of customer service with $6 an hour help. The thinking here, apparently, is that what works for the fast-food industry should work for the airline business just as handily.

Expenses and costs are so critical, we are told, that the company is spending $500 million to cut costs and enhance that sacred bottom line. Analysts, accountants, consultants and lawyers are hard at work, it would seem, destroying another fine American institution, and most of them probably have never had any practical experience in the world of airline complexities.

In betraying the trust and loyalty of more than 60,000 dedicated employees, Delta has lost the very thing that made it so prosperous and efficient over six decades.

And now has come the ultimate insult: Delta employees were called together and told that they would be responsible for training the cheap contract help that would

---

1. There is a factual dispute regarding whether Plaintiff's supervisor told Plaintiff to attempt to retract the letter from the Post. However, whether the supervisor so instructed Plaintiff is irrelevant. Defendant indicates that it did not fire Plaintiff because he ignored his supervisor's instructions, instead Defendant fired Plaintiff for conduct unbecoming a Delta employee.

be replacing them. This curious mandate speaks to corporate arrogance and ignorance of the first magnitude.

MICHAEL A. MARSH
Lakewood

As a result of the publication of this letter, on December 16, 1994, Plaintiff was summoned to a meeting where his supervisor, Dick Cassella, suspended Plaintiff indefinitely, without pay. On January 16, 1995, Plaintiff and Mr. Cassella had a second meeting where Mr. Cassella asked Plaintiff to resign. After Plaintiff refused to resign, Mr. Cassella fired Plaintiff "for conduct unbecoming a Delta employee." Mr. Marsh appealed his termination, and on January 31, 1995, flew to Atlanta to argue his case to two Delta managers. Approximately two weeks later, Plaintiff was informed by Mr. Cassella that his appeal had been denied.

In addition to the above facts, Defendant alleges, and Plaintiff denies, that approximately one year prior to the above described incident, Mr. Cassella instructed Mr. Marsh not to identify himself in any letters he sent to newspapers that were critical of Delta. Apparently, Mr. Marsh had made a habit of writing critical letters under a pen name. This disputed fact, however, is not material to the decision I make today on the merits.

Certain documents are important to the issues in this case. They include:

1) Delta's Standard Practice Manual, Personnel Conduct Standards and Appearance Guidelines (selected provisions, Exhibits D and F, Defendant's Opening Brief);

2) Delta's March 1990 Business Conduct Policy (Exhibit E, Defendant's Opening Brief)

3) Plaintiff's Employment Application (Exhibit I, Defendant's Opening Brief)

4) Help Preserve Delta's High Standards of Business Conduct (Exhibit G, Defendant's Opening Brief).

II. Cross–Motions for Summary Judgment—Analysis

A. *Wrongful Discharge—Colo.Rev.Stat. § 24–34–402.5 (Cross–Motions) (Claim 1)*

Both parties argue that they are entitled to summary judgment on the wrongful discharge claim. Colo.Rev.Stat. § 24–34–402.5, which became effective on July 1, 1990, protects employees who are engaging in a legal activity from being punished by their employer. Specifically, the statute, in relevant part, provides:

(1) It shall be discriminatory or unfair employment practice for an employer to terminate the employment of any employee due to that employee's engaging in any lawful activity off the premises of the employer during nonworking hours unless such a restriction:

(a) Relates to a bona fide occupational requirement or is reasonably and rationally related to the employment activities and responsibilities of a particular employee or a particular group of employees, rather than to all employees of the employer; or

(b) Is necessary to avoid a conflict of interest with any responsibilities to the employer or the appearance of such a conflict of interest.

In their briefs, and at the hearing on this matter, the parties agreed, and my independent research confirmed, that there exist no Colorado cases that interpret the substantive portions of this statute as they relate to the specific issues presented by this case. Moreover, the statute's legislative history is scant, and provides the Court with no illumination as to the meaning of the substantive portions of this statute.

Both parties agree that Plaintiff was engaged in a lawful activity when he wrote and sent the letter to the editor of the Denver Post. Plaintiff argues that he is entitled to summary judgment because Delta did not prohibit employees—in writing—from sending critical letters to the editor. Plaintiff also argues that none of the exceptions to the general rule—listed in the statute—apply. In contrast, Defendant argues that it is entitled to summary judgment because it was justified in firing the Plaintiff under the statute's following exceptions: 1) Plaintiff was terminated for engaging in an activity related to a bona fide occupational requirement; 2)

the activity was rationally related to Plaintiff's particular job responsibilities; 3) publication of the letter led to a conflict—or the appearance of a conflict—of interest between Plaintiff and Defendant; and 4) a portion of the activity occurred on Delta property.

## 1. *PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

■ I find that Plaintiff's claim that he is entitled to summary judgment because Defendant did not have a written policy prohibiting writing a letter to the editor is without merit and should be denied. In a recent case that was not selected for official publication, the Colorado Court of Appeals held that the wrongful discharge statute should be analyzed in two parts: first, did the employer terminate an employee for participation in a lawful activity; and second was there a statutory exception to justify that termination. *Gwin v. Chesrown Chevrolet, Inc.*, 931 P.2d 466, 470 (Colo.App.1996). The Court commented that "no specific restriction must be adopted by an employer as a predicate to violating the prohibition." *Id.* It logically follows, therefore, that if a specific prohibition does not need to be in effect for the statute to take effect, then a specific written prohibition does not need to be in place for the exceptions to the statute to apply. I conclude, therefore, that the language from *Gwin* dictates that the statute does not require an employer to adopt specific written restrictions for which it can terminate an employee, but merely requires that any restriction an employer is attempting to enforce must fall under the purview of the statute's exceptions.

## 2. *DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

Defendant's claim that it is entitled to summary judgment on the wrongful discharge claim must be analyzed under prong two of the *Gwin* analysis. That is, the Court must determine whether Delta can justify its actions under the exceptions provided in the text of Colo.Rev.Stat. 24–34–402.5.

■ Delta first urges that there is an implied bona fide occupational requirement of loyalty owed by employees to their employer that Plaintiff breached by writing the critical letter to the Denver Post. Therefore, Delta argues that it was justified in terminating Plaintiff under the first exception contained in the wrongful discharge statute.[2] Colo. Rev.Stat. § 24–34–402.5(1)(a). Because there is a paucity of Colorado case law on the issue, Defendant cites labor law cases where disloyalty was found to be an adequate cause for discharge. *NLRB v. Local Union No. 1229, International Brotherhood of Electrical Workers*, 346 U.S. 464, 475, 74 S.Ct. 172, 178, 98 L.Ed. 195 (1953); *George A. Hormel and Co. v. NLRB*, 962 F.2d 1061 (D.C.Cir.1992) (upholding termination for employee disloyalty). Defendant urges that these cases stand for the proposition that all employees owe an implied duty of loyalty to their employer. To determine the validity of Defendant's argument, I must examine the purpose of the statute.

The wrongful discharge statute, § 24–34–402.5, was created to protect employees in their "off-the-job-privacy." *Gwin*, at 469. More specifically, the law was meant to provide a shield to employees who engage in activities that are personally distasteful to their employer, but which activities are legal and unrelated to an employee's job duties. In application, this statute should protect the job security of homosexuals who would otherwise be fired by an employer who discriminates against gay people, members of Ross Perot's new political party who are employed by a fervent democrat, or even smokers who are employed by an employer with strong anti-tobacco feelings. *See Evans v. Romer*, 882 P.2d 1335, 1346–47 (Colo.1994). The one common thread that links all of these examples is that the statute shields employees who are engaging in private off-the-job activity, that is unrelated to the employees job

---

**2.** I note that Colo.Rev.Stat. 24–24–402.5 contains three exceptions, or affirmative defenses, in its text. Specifically, provision (1)(a) contains exceptions for bona fide occupational requirements as well as for activities that relate to a particular group of employees. Provision (1)(b) deals with the exception regarding conflicts of interest.

duties, from termination for participation in the non-work related activities.

■ This statutory shield, however, is not absolute. The fact that the Colorado legislature provided three exceptions to the general rule reflects the fact that the legislature recognized that the policy of protecting an employee's off-the-job privacy must be balanced against the business needs of an employer. By providing exceptions to the statute's general rule, the legislature indicated that it did not intend this privacy statute to provide a sword to employees thereby allowing employees to strike indiscriminate public blows against the business reputation of their employer. Accordingly, I find that one of the bona fide occupational requirements encompassed within the scope of Colo.Rev.Stat. § 24–34–402.5(1)(a) is an implied duty of loyalty, with regard to public communications, that employees owe to their employers.

The issue thus becomes whether this implied duty of loyalty is applicable to the circumstances of this case. It is undisputed that the letter written by Plaintiff was harshly critical of Delta. However, at the hearing, Plaintiff's counsel argued that even if there is an implied duty of loyalty, Plaintiff should not be held to that duty because Plaintiff was in a position analogous to a whistle blower.[3] That is, Plaintiff was reporting to the public that Delta was undermining safety by replacing long term employees with contract workers. If this claim were true, the implied duty of loyalty would be inapplicable to Plaintiff's actions. *See Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 108–110 (Colo.1992) (setting out elements for Colorado whistle blower claim, including protecting employees who are asked to forsake a public duty). However, the text of Plaintiff's letter makes clear that he could not be viewed as a whistle blower. Plaintiff was not exposing public safety concerns, instead he was a disgruntled worker venting his frustrations to his employer whom he felt betrayed him and his coworkers. The public concerns expressed in his letter relate to reduced customer service and not public safety. Further, it is undisputed that Plaintiff did not avail himself

of the internal grievance policy that Delta provided its workers by taking his concerns to management. (*See* Help Preserve Delta's High Standards of Business Conduct, Exhibit G, Defendant's Opening Brief) (providing Delta employees with a toll-free telephone number where they could report internal grievances without repercussion on their employment status). For these reasons, I find that because Plaintiff was not attempting to inform the public of a safety concern, and because Plaintiff did not attempt to solve his grievance through Delta's grievance system, his actions breached the bona fide occupational requirements of an implied duty of loyalty encompassed in Colo.Rev.Stat. § 24–34–402.5(1)(a). Accordingly, Defendant's termination of Plaintiff was justified under this statutory exception.

■ Although I have found that Delta acted properly in terminating Plaintiff, because my interpretation of the state statute is one of first impression, I will analyze the other arguments made by Delta in support of its actions. Delta's second argument is that as a customer service agent (baggage handler), Plaintiff had the special job responsibility of promoting a positive image for Delta. Therefore, Defendant argues Plaintiff breached his duty to promote a positive Delta image, thereby allowing the airline to fire Defendant under the statutory exception that allows prohibition of activities that relate "to the employment activities and responsibilities of a *particular employee or a particular group of employees, rather than to all employees of the employer.*" § 24–34–402.5(1)(a) (emphasis added). This argument is unpersuasive. Delta cannot seriously contend that it is the unique function of a baggage handler to portray a positive image for Delta while other employees are not charged with that same responsibility. The fact is this portion of the statute was probably crafted to allow employers to require certain high profile members of their staff from foregoing involvement in activities that would call into question their competence. If this portion of the statute is expanded to include all members of the workforce, the exception would

---

3. Plaintiff does not contend that he was entitled to write the letter to the Post under the whistle
blower doctrine; instead, he is merely claiming that his case is analogous to those cases.

swallow the general rule. Promotion of a positive image for Delta is not the exclusive province of baggage handlers. Thus, this exception does not apply.

Delta's third argument is that the letter to the Denver Post resulted in a conflict, or appearance of a conflict, of interest between Plaintiff and Delta. § 24–34–402.5(1)(b). Delta relies on provisions of its standard practice manual (Exhibits D and F, Defendant's Opening Brief) to support its position that Plaintiff's letter constituted a conflict of interest. The first provision cited is 1002.2 which prohibits Delta employees from participation in various competing businesses. Plaintiff's letter clearly does not fall into this category. Delta also cites provision 1125 which deals with the control of information by Delta. Delta, however, cannot rely on this provision because Plaintiff was not fired for revealing business information, rather, he was fired because of the insubordinate nature of the letter published in the Denver Post. Finally, Delta argues that a conflict of interest does not have to be financial to allow termination, citing *Wild v. U.S. Dept. of Housing*, 692 F.2d 1129 (7th Cir. 1982) (holding that HUD employee who moonlit as slumlord was properly terminated for a conflict of interest). However, when the government is involved, as in *Wild*, a conflict of interest cannot be financial because the government does not have a profit motive. In interpreting the plain meaning of the statute, the term conflict of interest should be given its generally understood meaning; that is, that it relates to "fiduciaries and their relationship to matters of private interest or gain to them" or a "situation in which regard for one duty tends to lead to disregard of another." *Black's Law Dictionary* 299 (6th ed. 1990). Plaintiff was not disregarding his duties in favor of personal gain by writing the Post. In fact, it cannot fairly be argued that Plaintiff sought any personal gain by writing the Post. Therefore, under the generally understood meaning of the term, Plaintiff did not have any conflict of interest when writing to the Post.

Finally, Defendant argues that because Plaintiff made a photocopy of the letter—which Plaintiff retained for his own records—on Delta premises that the statute does not protect Plaintiff. Specifically, § 24–34–402.5(1) limits protections to "employee's engaging in any lawful activity off the premises of the employer...." The Defendant, however, fails to demonstrate that the critical letter published in the Denver Post (the offense for which Plaintiff was fired) was written on Delta property. Although it may be true that Plaintiff broke a work rule by copying a personal letter on a Delta copying machine, it is disingenuous to suggest that the act for which Plaintiff was fired actually transpired on Delta property. Plaintiff drafted the letter away from Delta premises, on his own time, and sent the letter to the Denver Post where it was received, reviewed and published. Plaintiff's de minimis act of photocopying the letter on Delta property does not, by itself, vitiate the applicability of the statute.

For the foregoing reasons, I will GRANT Defendant's motion for summary judgment on the grounds that Plaintiff had a bona fide occupational duty to be loyal to Delta in his public communications regarding issues that do not implicate public safety. Because his letter to the editor was clearly critical of Delta, Defendant has an affirmative defense to Plaintiff's claim under § 24–34–402.5(1)(a).

B. *Breach of the Express or Implied in Law or in Fact Covenant of Good Faith and Fair Dealing (Defendant's Motion)* (Claim 2)

Defendant argues that Plaintiff's claim two (2) should be dismissed. Specifically, Defendant argues that under Colorado law there is no cause of action for breach of implied covenant of good faith and fair dealing in employment situations, and that a cause of action for breach of express covenant of good faith and fair dealing is equivalent to a claim of Breach of Contract and should be subsumed into claim three. I agree.

In opposition to Defendant's arguments, Plaintiff cites *Price v. Federal Express Corp.*, 660 F.Supp. 1388 (D.Colo.1987), wherein Judge Kane refused to dismiss a claim of breach of an implied covenant of good faith and fair dealing. Defendant points out, how-

ever, that Judge Kane subsequently reconsidered his position on the issue. In *Donohue v. Unipac Service Corp.*, 847 F.Supp. 1530 (D.Colo.1994), Judge Kane noted that the Colorado Court of Appeals has "expressly declined to accept [a] plaintiff's invitation to extend the implied covenant of good faith and fair dealing, found in some commercial contracts, to employment contracts." *Id.* at 1535 (citing cases). Although the Colorado Supreme Court has not decided the issue, all Colorado Court of Appeals decisions that have decided the issue have determined that there is no cause of action for breach of an implied covenant of good faith and fair dealing. *E.g. Farmer v. Central Bancorporation, Inc.*, 761 P.2d 220, 222 (Colo.App.1988) (noting that "[a]n implied covenant of good faith and fair dealing found in some commercial contracts does not extend to at will employment contracts.").

█ Moreover, Defendant is correct that a cause of action for breach of express covenant of good faith and fair dealing is in reality a breach of contract claim. More specifically, if the Defendant promised that it would act in good faith and deal fairly with Plaintiff, and the Plaintiff continued to perform his job based on that promise, then that covenant becomes a part of the contract between the parties. *See Continental Air Lines v. Keenan*, 731 P.2d 708 (Colo.1987) (contract can form by express agreement or by employee giving consideration of continued performance in response to employers new policies). In contrast, if no express agreement was reached between the parties (or at least no consideration was given by the parties) then any expressions on which Plaintiff relies as creating an express covenant are merely expressions that would create an implied covenant of good faith and fair dealing. In other words, if the actions of the parties do not amount to a contractual relationship, then any covenant between the parties must arise by implication. Because Colorado does not recognize an implied covenant in employment contracts, as discussed *supra*, there is no cause of action to be heard.

Both parties argue that the recently decided case of *Decker v. Browning–Ferris Industries of Colorado, Inc.*, 931 P.2d 436 (Colo.

1997), support their position. In *Decker,* the Colorado Supreme Court held that there was no tort for breach of an express covenant of good faith and fair dealing, in the employment context, under Colorado law. *Id.* at 440. The Court, however, did allow economic and noneconomic damage awards for a breach of an express covenant of good faith and fair dealing, that sounded in contract, to stand. *Id.* at 447–48. In discussing the express covenant of good faith and fair dealing claim, the Court noted that "the jury found that BFI breached an express contractual obligation to Decker and that such breach was characterized by willful and wanton conduct. Damages for 'mental suffering' are recoverable on a breach of contract claim when the breach is accompanied by willful and wanton conduct...." *Id.* at 448. Based on this language, it is clear that the Court in *Decker* recognized that a breach of an express covenant of good faith and fair dealing claim is equivalent to a breach of contract claim. That is, if an employer makes a promise to deal with an employee in a fair manner, and the employee gives the consideration of continued performance in response to this promise, and later the employer breaks its promise, then the employee has a cause of action for breach of contract. Therefore, I will evaluate Plaintiff's arguments that promises of good faith and fair dealing were made when considering the question of whether an employment contract—besides an at will contract—formed between Plaintiff and Defendant.

For the above reasons, I will GRANT Defendant's Motion for Summary Judgment on Plaintiff's claim two (2) because there is no Colorado cause of action, in the employment context, for a breach of an implied in law or in fact covenant of good faith or fair dealing, and because a cause of action for breach of an express covenant of good faith and fair dealing is, in reality, a breach of contract claim.

### C. *Breach of Contract* (Claim 3)

█ Plaintiff's final claim is for breach of contract. There is a presumption in Colorado law that "[a]n employee who is hired in Colorado for an indefinite period of time is

an 'at-will employee,' whose employment may be terminated by either party without cause and without notice, and whose termination does not give rise to a cause of action." *Continental Air Lines, Inc. v. Keenan,* 731 P.2d 708, 711 (Colo.1987) (citations omitted). This presumption is bolstered by the fact that Plaintiff's job application and Delta's Standard Practice Manual contained language that made clear that Delta employees were at-will employees. (Defendant's Opening Brief at 25–26 and documents cited therein). Plaintiff must overcome this presumption to successfully counter Defendant's motion for summary judgment. However, "this presumption of 'at-will' employment . . . should not be considered absolute but rather should be rebuttable under certain circumstances." *Id.* Specifically, an at-will "employee may be entitled to relief under ordinary contract principles if he can demonstrate, first, that in promulgating . . . termination procedures the employer was making an offer to the employee . . . and second, that his initial or continued employment constituted acceptance. . . ." *Id.*

■ In his response brief, Plaintiff argues that three Delta documents contain language that can be construed as creating a contract under the *Continental Air Lines* test. Specifically, Plaintiff cites the 1990 Delta Airlines Business Conduct Policy (Exhibit E, Defendant's Opening Brief, p. 593, ¶¶ 1–2), Delta's Standard Practice Manual (Exhibit D, Defendant's Opening Brief, p. 147 § 1000.3, ¶ 1), and Help Preserve Delta's High Standard of Business Conduct (Exhibit G, Defendant's Opening Brief, p. 2, column 3, ¶ 1 and p. 1, column 2, ¶ 6).

The language from the 1990 Delta Airlines Business Conduct Policy on which Plaintiff relies is: "This 'Code of Business Conduct' states the principles of business ethics and conduct that each of us must follow in dealings on behalf of the company with . . . other Delta personnel. Delta stands for the best in service and for fair dealings." The provision of the Standard Practice Manual on which Plaintiff relies states: "Delta is firmly committed to a policy of equal opportunity. . . . Delta's equal opportunity program . . . consists of the following policies and objectives:

. . . (2) continuing the company's goal of . . . fair treatment of all personnel." Finally, the provisions of Help Preserve Delta's High Standard of Business Conduct on which Plaintiff relies state that "[n]o disciplinary action will be taken against an employee solely for disclosing wrongdoing." However, it should be noted that this last document provides an internal toll-free (800) number for Delta employees to anonymously report breaches by other employees of standard business conduct.

Plaintiff argues that the above quoted statements create jury questions of whether a contract formed between Delta and Plaintiff that required Delta to treat Plaintiff in a fair manner and whether Defendant actually did treat Plaintiff in a fair manner. *See Tuttle v. ANR Freight System, Inc.,* 797 P.2d 825, 827–28 (Colo.App.1990). Plaintiff is correct that the existence of an implied contract is normally a question of fact for the jury. *Orback v. Hewlett–Packard Co.,* 909 F.Supp. 804 (D.Colo.1995), *aff'd,* 97 F.3d 429 (10th Cir.1996). However, as this Court noted in *Orback:*

> the issue may be decided as a matter of law if (1) there is a valid disclaimer stating the policies are not intended to create a contract; (2) the alleged promises are nothing more than 'vague assurances'; or (3) if the undisputed facts otherwise 'indicate that the employer did not intend the manual to operate as a contractual offer to the employee.'

*Id.* at 807 (quoting *Vasey v. Martin Marietta Corp.,* 29 F.3d 1460, 1464–65 (10th Cir.1994) (other internal citations omitted)). In the present case, the "promises" contained in the documents cited by Plaintiff can, at best, be considered vague assurances. In *Vasey,* the Tenth Circuit concluded that documents that contained general aspirational statements, but that did not contain "detailed lay-off guidelines or other guarantees of employment" were not sufficient to support an implied contract claim. *Vasey* 29 F.3d at 1465–66. Like the documents in question in *Vasey* the statements in Delta's documents do not set forth any employment terms, explain disciplinary procedures, or detail any prohibited conduct. Instead, the statements are best

characterized as "vague assurances" that cannot be the basis for an implied contract. *Id.*

For the above reasons, I will GRANT Defendant's Motion for Summary Judgment on the Breach of Contract Claim. The Plaintiff has failed to present evidence sufficient to create a jury question of whether a contract formed between Plaintiff and Defendant. Instead, the statements on which Plaintiff relies are merely vague assurances that do not constitute definite terms of employment.

III.   Conclusion

Accordingly, it is hereby

ORDERED that Plaintiff's Motion for Partial Summary Judgment is DENIED.   It is

FURTHER ORDERED that Defendant's Motion for Summary Judgment on all claims is GRANTED and this case is DISMISSED with prejudice.